

# MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

THOMAS G. BLAYLOCK, ET AL.,   )
   )
     Appellants-Respondents,   )
   )
v.   )    **WD86907**
   )    **Consolidated with WD86939**
   )
STEVEN R. BLAYLOCK, ET AL.,   )    **Filed: May 20, 2025**
   )
     Respondents-Appellants.   )

### APPEAL FROM THE CIRCUIT COURT OF PETTIS COUNTY
### THE HONORABLE ROBERT L. KOFFMAN, JUDGE

### BEFORE DIVISION ONE: KAREN KING MITCHELL, PRESIDING JUDGE, LISA WHITE HARDWICK, JUDGE, AND MARK D. PFEIFFER, JUDGE

Thomas and Martha Blaylock (collectively, "Plaintiffs") appeal the circuit court's judgment partitioning in kind real property that Thomas and his three siblings, Steven Blaylock, Charles Blaylock, and Nancy Richmond (collectively, "Defendants") inherited from their mother's estate. Plaintiffs contend dividing the property in kind[1] instead of ordering all of the property sold (and the proceeds distributed) resulted in great prejudice

---

[1] "Partition in kind" is a method of dividing jointly owned property by physically dividing it into separate portions, each with individual ownership, rather than having it sold and the sale proceeds distributed.

to them.  Defendants cross-appeal, arguing the court erred in awarding attorney fees to Plaintiffs' counsel; ordering the four siblings' partnership crop revenue to be paid out as part of the judgment in partition and for payment of attorney fees; and finding Thomas made no draws from the siblings' partnership account.  For reasons explained herein, we affirm.

## FACTUAL AND PROCEDURAL HISTORY

After their mother died in 2012,[2] Thomas, Steven, Charles, and Nancy[3] each inherited an undivided one-fourth interest in their parents' real property ("family farm"), which consisted of approximately 265 acres of grazing land, timber, pasture, and row crop fields in Pettis County, including a 56.4 acre tract of crop land known as the "horseshoe."  Their parents' home, barn, a shop, and other buildings were also on the family farm.  The siblings inherited their parents' personal property as well, including the contents of their parents' home and shop, older farm machinery, cattle, crops stored in a grain elevator, the funds in the checking account of their mother's estate, and other miscellaneous items.

When their mother's estate was closed in 2013, the siblings decided to continue running their parents' cattle operation, allowing a sharecropper to grow crops on the land, and baling hay on the pastureland as a partnership or joint venture.  They had no written agreement memorializing the partnership.  The siblings used the checking account from

---

[2] Their father predeceased their mother.

[3] When referring to Thomas Blaylock, Steven Blaylock, Charles Blaylock, and Nancy Richmond individually, we will use their first names.  No familiarity or disrespect is intended.

their mother's closed estate to deposit income and pay bills. Nancy handled the estate checking account and bookkeeping for the partnership and dealt with the sharecropper. At the end of the year, Nancy gave each of the siblings a written summary of their share of income and expenses for tax purposes.

During the administration of their mother's estate and for a few years after, Thomas was paid for work he performed on the family farm. He submitted bills for this work to Nancy, who paid him with checks from the estate checking account. After Steven told Thomas there was no money in the estate checking account to cover his check in June 2016, Thomas stopped submitting bills and no longer received payments from the estate. Thomas sold the cattle in 2020, and the proceeds of the sale were deposited into the estate checking account.

During the years 2014 to 2016, Defendants took out draws from the estate account. Some of the draw checks indicated the payments were loans, but only a small portion of those loans were repaid. Thomas did not receive any draws and was not notified prior to Defendants' draws.

In June 2016, Thomas and his wife Martha made an offer to Defendants to purchase the entire family farm. Defendants refused the offer, and their relationship with Plaintiffs soured thereafter. In May 2017, Plaintiffs filed a petition against Defendants requesting a court order to sell the family farm and divide the proceeds among the four siblings. In 2018, Plaintiffs filed an amended petition requesting the court to: (1) quiet title to the family farm, including additional land that had been created through accretion, in favor of Thomas, Steven, Charles, and Nancy; (2) partition the family farm by ordering

3

it sold at a public auction and the proceeds divided among the four siblings; (3) partition the personal property they inherited from their parents by ordering it sold at a public auction and the proceeds divided among the four siblings; (4) order an accounting of the family farm's income and expenses from 2011 through 2018 and set off their respective fractional share of the net income derived from the family farm; and (5) find Defendants were unjustly enriched by the draws they made from the estate checking account without first notifying Thomas and by the work Thomas did on the family farm after he stopped receiving payments in June 2016.

In May 2019, the court entered an interlocutory order quieting title to the entirety of the family farm in the four siblings. That same month, Plaintiffs purchased a 15-acre tract of a neighbor's adjoining land that the family had used for decades to access the horseshoe crop land on the family farm. The horseshoe was accessible only by crossing another portion of the family farm and the neighbor's 15-acre tract. Before Plaintiffs bought the 15-acre tract, Thomas told Defendants he was seeking to buy only an easement from the neighbor for this 15-acre tract, for the benefit of the partnership, for ingress and egress to the horseshoe. Instead, Plaintiffs bought the 15-acre tract in fee simple absolute for themselves. Plaintiffs rendered the horseshoe landlocked, as Thomas told Defendants they could not cross the 15-acre tract that he now owned and that, if there was a partition sale of the family farm, no potential buyers would be allowed to cross this tract to evaluate whether to buy the horseshoe or to farm the horseshoe upon purchase. Thomas claimed his reason for buying the 15-acre tract was to satisfy a lender's condition to obtain a loan so he could buy the family farm at a partition sale.

4

Defendants, however, claimed Thomas's intent was to depress the value of the family farm at a partition sale so he could buy the family farm outright at a lower price.

Defendants filed an answer and counterclaims, which they later amended. In their amended answer, Defendants sought to dismiss Plaintiffs' partition action based on allegations of Plaintiffs' unclean hands. In their counterclaims, Defendants asked the court to: (1) find Plaintiffs committed fraud, breach of fiduciary duty, and negligence in purchasing the neighbor's 15-acre tract and in not properly managing the family farm; (2) wind up and terminate the partnership and order a limited accounting; and (3) find Thomas was negligent for failing to exercise ordinary care and to follow accepted practices in caring for the cattle and maintaining the family farm.

On the first day of the bench trial of the parties' claims in November 2022, Defendants filed their consent to a Rule 96.09[4] award of the horseshoe tract to Thomas as his one-fourth share of the family farm, with the residue to Steven, Charles, and Nancy as tenants in common in equal shares. During his testimony, Thomas rejected Defendants' offer, explaining he did not believe the family farm could be divided into fourths due to its nature, dividing it into fourths among the siblings would be unfair and harmful, and the only fair thing to do would be to sell it at a public auction. When Steven testified, he told the court that he, Charles, and Nancy did not want to sell the family farm, and he

---

[4] Rule 96.09 provides that, in partition actions, "[t]he court may order that any number of shares be set off together in one parcel and that the residue be divided among the other parties, according to their several rights."

reiterated Defendants' request to set aside the horseshoe to Thomas and the remaining real property to them.

After a two-day trial, the court entered an interlocutory order of partition in kind. In its order, the court ordered, *inter alia*, that the horseshoe, which it valued at $250,074 pursuant to a court-ordered appraisal of the entire family farm, be awarded to Thomas "subject to advisement by report of three disinterested commissioners pursuant to Rule 96.12 and Section 528.200."[5] The court further ordered that the commissioners conduct a sale of the partnership's personal property. Additionally, the court ordered the partnership dissolved effective June 2016, "when the parties broke off their relationship," and ordered that the parties wind up their affairs and that Nancy make an accounting of the partnership business.

Following the filing of the commissioners' report recommending partition in kind of the family farm, the court held a hearing on Plaintiffs' objections to the report in October 2023. After Nancy filed original and amended accountings of the partnership's business, the court held another hearing in December 2023 and then entered its final judgment on December 20, 2023. In its final judgment, the court made express findings that both parties had unclean hands. Specifically, the court found that Thomas had unclean hands because his reason for buying the 15-acre tract and preventing prospective buyers from crossing his property to get to the horseshoe was to depress the fair market

---

[5] All statutory references are to the Revised Statutes of Missouri 2016. Rule 96.12 and Section 528.200 provide that, when a court renders a judgment of partition in kind, the court must appoint commissioners to make the partition.

value of the family farm so he could buy it outright. The court found that Defendants had unclean hands because they took monies out of the partnership from 2014 to 2016 as "so-called loans" without notifying Thomas before doing so, and Defendants sold crops in 2016 without seeking any input from Thomas.

Per the commissioners' recommendation on Plaintiffs' partition claim, the court found that the family farm should be divided in kind. The court awarded the horseshoe to Thomas, along with an owelty[6] of $16,295 to offset the difference in the equitable values, which was to be paid to Thomas from the proceeds of the sale of the partnership's crops. The court apportioned the remaining 208.6 acres of the family farm to the Defendants as tenants in common. The court noted the partnership's personal property was sold at an auction conducted by the commissioners, and the only purchasers were Thomas, Steven, and Nancy. The court ordered each sibling's purchased personal property from the auction be paid for out of that sibling's portion of the proceeds from the sale of the partnership's crops. The court found the accounting showed Thomas received no draws against the partnership, but Nancy received net draws of $12,147, Steven received net draws of $8,000, and Charles received net draws of $10,700. The court stated these draws would be considered in determining each party's respective share of the

---

[6] "Owelty is '[a] sum of money paid by one of two . . . co-tenants to the other, when a partition has been effected between them, but, the land not being susceptible of division into exactly equal shares, such payment is required to make the portions respectively assigned to them of equal value.'" *Hoit v. Rankin*, 320 S.W.3d 761, 765 n.8 (Mo. App. 2010) (quoting BLACK'S LAW DICTIONARY 996 (5th ed. 1979)).

partnership's net assets. The court found in favor of Defendants on Plaintiffs' unjust enrichment claim.

On Defendants' counterclaims, the court found in favor of Thomas on Defendants' claims for fraud, breach of fiduciary duty, and negligence. The court found in favor of Defendants on their claim for an order dissolving the partnership and winding it up. The court found in favor of Thomas on Defendants' claim that he was negligent in caring for the cattle and maintaining the family farm.

The court then partitioned the incorporeal partnership property, ordering that the siblings each receive one-fourth of the $1,705.37 in the partnership's bank account. The court found the remaining partnership monies of $210,646.14, which were the proceeds from the crop sales, should be distributed as follows: $18,808 to Plaintiffs' attorney as attorney fees under Section 528.530; $58,051.40 to Thomas; $47,997.58 to Charles; $49,848.58 to Steven; and $35,940.58 to Nancy.

Defendants filed a motion to reconsider, amend the judgment, grant a new trial, or reopen the evidence. Among other things, they argued the court erred in distributing over $220,000 in partnership assets, which was revenue from the crop sales, in the partition action, and the court erred in ordering that the $18,808 in attorney fees awarded to Plaintiffs' attorney be paid from the partnership's crops sales revenue. The court subsequently entered an amended judgment stating that, because the parties had failed to wind up the partnership business as the court had ordered them to do in December 2022, the court's judgment of December 20, 2023, did it for them by ordering the crops in storage sold and the proceeds placed in the court's coffers. The court noted there were

two post-judgment bills that had not been paid and ordered Thomas to pay a quarter of them. The court adopted the December 20, 2023 judgment and made it part of the amended judgment.

Defendants made another motion to amend the judgment, grant a new trial, or reopen the evidence. Again, the Defendants challenged the distribution of the proceeds from the crop sale, the attorney fees award to Plaintiffs' attorney, and the court's winding up of the partnership. The court entered an order emphasizing that, because the parties did not wind up the partnership as ordered, the court used the evidence at trial to determine the liabilities, available assets, and equities of the partners to do so. Plaintiffs appeal, and Defendants cross-appeal. Additional facts will be discussed as they relate to each point.

### STANDARD OF REVIEW

A partition action is reviewed under the same standard as any other court-tried case. *Hoit v. Rankin*, 320 S.W.3d 761, 765 (Mo. App. 2010). We will affirm the judgment unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). We defer to the circuit court's "findings of fact because of its superior ability to assess the credibility of witnesses." *Hoit*, 320 S.W.3d at 765. This is true even when a witness's testimony is not contradicted, because the circuit court "is free to believe or disbelieve all, part or none of the evidence, including . . . evidence that is uncontroverted." *Tadych v. Horner*, 336 S.W.3d 174, 177 (Mo. App. 2011) (citation omitted). "We examine the evidence in the light most favorable to the judgment

9

and disregard all contrary evidence and inferences." *Id*. We review questions of law *de novo*. *Hoit*, 320 S.W.3d at 765.

ANALYSIS

*Plaintiffs' Appeal*

In their two points on appeal, Plaintiffs contend the circuit court erred in ordering the family farm partitioned in kind. In Point I, Plaintiffs argue that, because of the farm's varied types of land and their respective values, drainage, buildings, and accessibility, the farm cannot be divided in kind without it resulting in great prejudice to the parties. In Point II, Plaintiffs assert the division in kind did, in fact, result in great prejudice to them because their award in partition – the horseshoe plus the $16,295 owelty – was materially less than the money equivalent they could have obtained from a sale of the whole family farm. We will address these points together.

Rule 96.08 provides that, in a partition suit, the court "shall determine the interests of the parties and order partition in kind or the sale of the land." A partition in kind is favored over a partition by sale "unless it would result in great prejudice to the owners." *Von Behren v. Oberg*, 902 S.W.2d 338, 340 (Mo. App. 1995). "Partition is a question of fact for the trial court; and the findings of the trial court are afforded great weight if there is substantial evidence to support them." *Id*. "The test of whether partition in kind would result in great prejudice to the owners is whether or not the value of the share of each, after partition, would be materially less than the share of the money equivalent that each could probably obtain from the whole." *Id*.

10

> The foregoing, however, is tempered by the requirement that the evidence presented must be directed to "the situation of the property and its physical characteristics, which necessarily control the question of whether it was practicable to divide the same between the parties according to their respective interests, giving each his or her share, quantity, and quality, relatively considered, *without materially lessening the money value of the several interests*."

*Keen v. Campbell*, 249 S.W.3d 927, 931 (Mo. App. 2008) (quoting *Gebauer v. Gebauer*, 165 S.W.2d 333, 335 (Mo. App. 1942)).

In addressing the partition claim in its judgment, the circuit court first recognized the total value of the family farm of $1,065,475 and the relative values of each of the family farm's different categories of land, including bottom crop land, upland row-crop land, pasture and building sites, and wooded land, as determined by the court-ordered appraisal of the property. The court then identified the acreage of the two categories of land (approximately 47 acres of bottom crop land and 8 acres of woods) that comprise the 56.4-acre horseshoe and compared it to the acreage of the categories of land (approximately 99 acres of crop land and 51 acres of pastures and woods) in the remaining 208.6 acres of the family farm. The court found that the horseshoe, valued at $250,074, consists of 21% of the family farm's total acreage, which is equal to 40% of the most valuable crop land on the family farm. After noting the three disinterested commissioners determined, by a majority decision, that the real property could be divided in kind, the court awarded the horseshoe, plus an owelty of $16,295, to Thomas, and the remaining 208.6 acres of the family farm to Defendants as tenants in common.

To support their contention that the division results in great prejudice to them, Plaintiffs cite the appraiser's testimony that a division in kind would be "difficult" and

Thomas's testimony that the family farm could not be divided into fourths without having "little pieces everywhere that is kind of all intermixed." Clearly, the court chose not to accept this testimony, and we defer to its decision. Plaintiffs next note that the sharecropper testified the horseshoe occasionally floods. The sharecropper also testified, however, that *all* of the crop land – not just the crop land in the horseshoe – has the same propensity to flood. Again, the court was entitled to accept this portion of the sharecropper's testimony. Plaintiffs further assert they are prejudiced because the horseshoe is landlocked. They point out that, in addition to crossing the 15-acre tract they purchased from the neighbor, they have to cross a portion of Defendants' property to access the horseshoe. In its judgment, the court recognized this and granted Thomas a 40-foot easement on Defendants' property for egress and ingress onto the horseshoe.

Lastly, Plaintiffs argue that the mere fact that the court awarded them $16,295 "to offset the difference in the equitable values" between the real property awarded to them and to Defendants is prima facie evidence that the partition of real property in kind results in great prejudice to them. They argue that, if the division of the real property had been equal in value, there would have been no need for the court to award them an owelty. Plaintiffs cite no case law to support the proposition that an award of an owelty indicates a party will suffer great prejudice by the in kind division. Indeed, "'[t]he power to grant owelty has been exercised by the courts of equity from time immemorial.'" *Hoit*, 320 S.W.3d at 765 n.8 (quoting BLACK'S LAW DICTIONARY 996 (5th ed. 1979)). The evidence shows the court carefully considered the physical characteristics of the property and the differences in value in determining that partition in kind, with an owelty awarded

12

to Plaintiffs, was appropriate and would not result in great prejudice to the parties. Because the court's judgment is supported by substantial evidence and does not erroneously declare or apply the law, we deny Points I and II of Plaintiffs' appeal.

***Defendants' Appeal***

In Point I, Defendants contend the court erred in awarding $18,808 in attorney fees to Plaintiffs' counsel in the partition action. Defendants argue Plaintiffs' unclean hands bar any recovery of attorney fees, the award shocks one's sense of justice in light of Plaintiffs' and Plaintiffs' counsel's misconduct, and Plaintiffs' counsel did not perform any services that benefitted Defendants.

Plaintiffs' counsel requested fees under Rule 528.530. Section 528.530 provides that, in a partition suit, the judge "shall allow a reasonable fee to the attorney or attorneys bringing the suit." The rationale for this rule is that both parties benefit from the work of the attorney who handles the partition case, so "the defendant should not be permitted to escape the common burden, and throw upon the plaintiff the whole of it." *Karstens v. Evans*, 688 S.W.3d 782, 786 (Mo. App. 2024) (internal quotation marks and citations omitted). Thus, "courts permit the attorney responsible for bringing the action to be compensated out of the common fund realized from the sale of the property." *Hoeper v. Liley*, 527 S.W.3d 151, 158 (Mo. App. 2017) (internal quotation marks and citation omitted). Because an award of attorney fees in a partition action is "predicated on the theory that the attorney who instituted the partition action acts on behalf of both parties, it is generally limited to such work as would be required in an uncontested suit." *Id.* (internal quotation marks and citations omitted).

We review the circuit court's award of attorney fees for an abuse of discretion. *Karstens*, 688 S.W.3d at 786. To demonstrate an abuse of discretion, the complaining party must show the decision "was against the logic of the circumstances and so arbitrary and unreasonable as to shock one's sense of justice." *Id*. (citation omitted). The circuit court is considered an expert at setting an award of attorney fees, "given its familiarity with all of the issues in the case and with the character of the legal services rendered, and may determine attorney fees without the aid of evidence." *Hoeper*, 527 S.W.3d at 158 (internal quotation marks and citations omitted).

At trial, Thomas testified his total bill for attorney fees was $30,054.96, plus additional fees for two days of trial at the rate of $250 per hour. Defendants objected to awarding Plaintiffs' counsel any fees, arguing Plaintiffs' counsel was acting only for the purpose of Plaintiffs' acquiring the family farm in a partition sale. In overruling Defendants' objection, the court informed the parties: "The Court is the expert on fees, and an understanding of the law. The Court grants the request and application in Exhibits 20 and 24 [the invoices of Plaintiffs' counsel]. The Court will make its own decision on what the attorney's fees should be." In its judgment, the court awarded $18,808 in attorney fees to Plaintiff's counsel, to be paid out of the proceeds from the crop sale before dividing the proceeds among the four siblings.

In arguing Plaintiffs' conduct should bar Plaintiffs' counsel from recovering any fees for her work in the partition action, Defendants list actions they assert constitute evidence of Plaintiffs' and Plaintiffs' counsel's misconduct before and during the pendency of this case. The record shows the circuit court was aware of all of these

14

actions of Plaintiffs and Plaintiffs' counsel and found only that Plaintiffs' attempt to depress the fair market value of the family farm by threatening to prohibit potential buyers from accessing the horseshoe across their property constituted evidence of unclean hands. We defer to the court's implicit determination that these other actions were not misconduct or further evidence of Plaintiffs' unclean hands.

The court found *both* parties had unclean hands in this case, as Defendants had taken draws from the partnership account and sold crops without notifying Thomas first. Defendants contend only Plaintiffs' unclean hands should be considered in determining whether Plaintiffs' counsel is entitled to attorney fees in the partition action. We disagree. "[T]he doctrine of unclean hands is not one of absolutes and can be used in the discretion of a court of equity." *Pony Express Cmty. Bank v. Campbell*, 206 S.W.3d 399, 402 (Mo. App. 2006) (internal quotation marks and citations omitted). "The doctrine should thus be applied when it promotes right and justice by considering all of the facts and circumstances of a particular case." *Id*. (internal quotation marks and citation omitted).

Throughout the judgment, the court made findings indicating it considered the behavior of both parties and the effect of their behavior on the litigation. For example, in denying Defendants' counterclaim for fraud, breach of fiduciary duty, and negligence, the court found Defendants "have not been harmed by the claimed inequitable actions of [Plaintiffs]," as Defendants "have consistently pleaded and argued that the partnership property should be divided in kind and that is what they have received." Because both

15

parties had unclean hands, the court decided the parties were entitled only to the equitable remedy of partition and were not entitled to any other equitable remedies.

The same trial judge presided over the case for the entire seven years it was pending. This judge was undoubtedly familiar not only with both parties' behavior, but also with Plaintiffs' counsel's efforts in effectuating the partition in kind of the family farm. Among other things, Plaintiffs' counsel had a title search performed in anticipation of the case, which informed all parties of the legal title holders of the real property. Plaintiffs' counsel had the land that was acquired by accretion surveyed so there was a legal description for this property. Plaintiffs' counsel filed the case that instituted the partition action, had all interested parties served, and prepared a proposed order at the court's request. Defendants received their anticipated benefit from the partition suit, as they were awarded a portion of the real property according to their ownership interests. In these circumstances, the court's award of attorney fees to Plaintiffs' counsel for work performed in the partition action does not shock our sense of justice or indicate a lack of careful consideration. Defendants' Point I is denied.

In Point II, Defendants contend the circuit court erred in ordering Plaintiffs' attorney fees for the partition action be paid out of the partnership crop revenue of approximately $220,000. Defendants argue that, because the partition of the family farm was in kind, the attorney fees should be paid through the process of an execution levied on the real estate of each party whose share was set off in kind, pursuant to Section 514.220. Defendants also assert the court erred in ordering the balance of the crop

16

revenue be paid in specific sums to each partner instead of pursuant to the rules for distribution set forth in Section 358.400 of the Uniform Partnership Act.

The problem with Defendants' argument under this point is that they fail to demonstrate *any* prejudice from the manner in which the court distributed the crop revenue. "[O]nly prejudicial error is reversible error." *Brown v. Brown-Thill*, 543 S.W.3d 620, 632 (Mo. App. 2018). Both parties requested distribution of the crop revenue. In his trial testimony, Thomas asked the court to partition the crop revenue as part of the partition of the personal property, and he requested Plaintiffs' attorney fees for the partition action be paid out of the proceeds of the sale of the crops. In their counterclaim for a winding up and termination of the partnership and a limited accounting, Defendants expressly asked the court to "make an overall accounting of the equities between the partners as part of ordering a judicial dissolution of the partnership." That is exactly what the court did. As the court explained in its order denying Defendants' second post-trial motion to amend the judgment, because the parties did not wind up the partnership as ordered in December 2022, the court used the evidence at trial to determine the liabilities, available assets, and equities of the partners to effectuate the winding up of the partnership. The attorney fees for the partition action were a liability for all four of the partners, which the court paid out of the crop revenue, an available asset. The court distributed the remainder of the crop revenue after a balancing of the equities of the partners. As Defendants do not explain how they were prejudiced by this distribution, they have failed to demonstrate the court committed reversible error. Defendants' Point II is denied.

17

In Point III, Defendants assert the circuit court erred in finding Thomas did not take any draws against the partnership. Specifically, they argue that, because the court denied Thomas's unjust enrichment claim in which he sought compensation for work he performed on the family farm after June 2016, the payments Nancy made to Thomas for work he performed between 2013 and June 2016 should be deemed draws to be credited against his share of the partnership's profits and losses.

Defendants' argument misinterprets the court's findings on Thomas's unjust enrichment claim. The reason the court denied Thomas's unjust enrichment claim for compensation for the farm work he did after June 2016 was because it found Thomas failed to meet his burden of proving he was entitled to payments *from June 2016 going forward*. Discussing the partnership's payment history for Thomas's labor, the court explained that, during the administration of their mother's estate, Thomas had an agreement with the estate attorney to be paid for his work on the farm. After the estate was closed in 2013, Thomas did not have an agreement with the other partners; however, he periodically provided requests for payment, and payments from Nancy were forthcoming. After June 2016, Thomas did not make any further requests for compensation and was paid nothing. Also, the court found Thomas quit maintaining the family farm after June 2016, and the other partners did some work on the farm but were not paid for their labor either. Therefore, the court found Thomas did not have a contract to be paid for his labor and did not request payment after June 2016.

Simply because the court found Thomas failed to prove he was entitled to compensation for his farm work from June 2016 going forward does not mean the court

necessarily had to find that the payments Thomas received for the farm work he performed before June 2016 were draws and not compensation for work performed. In fact, in both their pleadings and at trial, Defendants themselves characterized the payments Thomas received from 2013 to June 2016 as compensation for work performed. In paragraph 28 of their amended answer, filed in October 2021, Defendants recognized that Thomas was paid for his "'services' in handling the cattle farm operation and the hay management/harvesting conducted on the family farm," but they argued he was overpaid because his services were subpar. In paragraph 29 of their amended answer, Defendants acknowledged the "capital draws" they had taken during the partnership and stated, "There have been repeated offers extended to Tom to equalize the distributions of each partner (with appropriate distribution to Tom)." This indicates Defendants did not consider the prior payments to Thomas for his farm work to be draws. In paragraph seven of their counterclaim, Defendants alleged that, after their mother's estate was closed, Thomas "periodically submitted a statement/bill to Nancy for payment to him of charges for his services, reimbursement of expenses advanced or other fees/charges relating to family farm business operations." Defendants further alleged there was no specific agreement between the siblings for payment of wages to Thomas, "but rather by course of conduct Nancy issued a check to Tom in payment of statements submitted by Tom." At trial, Steven admitted that, after he told Thomas in June 2016 that the checking account did not have enough funds to cover Thomas's latest check, he wanted to get Thomas "caught up on the monies owed to him."

Defendants' pleadings and the evidence at trial indicate they considered the payments made to Thomas between 2013 and June 2016 to be compensation for work he performed on the farm. We recognize that, in the original and amended partnership accountings Nancy submitted to the court after the trial and after the court had entered its interlocutory order indicating Defendants' "so-called loans" from the partnership constituted evidence of their unclean hands, Nancy labeled the payments to Thomas as "partnership draws" or "payment/draws." The court rejected this belated attempt to recharacterize the 2013 to June 2016 payments to Thomas as draws, expressly finding in its judgment that Thomas "received no 'draws' against the partnership." The record supports the circuit court's finding. Defendants' Point III is denied.

## CONCLUSION

The judgment is affirmed.

_____
LISA WHITE HARDWICK, JUDGE

All Concur.